[Cite as *State v. Marcum*, 2017-Ohio-7517.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   27059 |
| | : | |
| v. | : | T.C. NO. 14-CR-164A/B |
| | : | |
| LISA MARCUM | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___8th___ day of _____September_____, 2017.

. . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

THOMAS M. KOLLIN, Atty. Reg. No. 0066964 and NATHAN D. BOONE, Atty. Reg. No. 0095986, 2372 Lakeview Drive, Suite H, Beavercreek, Ohio 45431
    Attorneys for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1}  This matter is before the Court on the Notice of Appeal of Lisa R. Marcum, filed March 28, 2016.  Marcum appeals from her March 28, 2016 Judgment Entry of Conviction, following a bench trial, on one count of insurance fraud ($7,500.00 or more and less than $150,000.00), in violation of R.C. 2913.47(B)(1), a felony of the fourth

degree; one count of theft from an elderly person (beyond the scope of consent) ($7,500.00 or more, less than $37,500.00) in violation of R.C. 2913.02(A)(2), a felony of the third degree; one count of tampering with records, in violation of R.C. 2913.42(A)(2), a felony of the third degree; one count of theft (checks), in violation of R.C. 2913.02(A)(1), a felony of the fifth degree; and one count of bribery, in violation of R.C. 2921.02(C), a felony of the third degree.   Marcum was sentenced to 18 months for insurance fraud, 36 months for theft from an elderly person, 36 months for tampering with evidence, 12 months for theft, and 36 months for bribery, all terms to be served concurrently. The court ordered restitution in favor of Scott Schaurer in the amount of $28,220.67.   We hereby affirm the judgment of the trial court.

{¶ 2}  Marcum was indicted on April 16, 2014 on all but the bribery offense.   After she stood mute, the court entered a plea of not guilty on her behalf on May 2, 2014.   On February 5, 2015, the State filed a motion to amend the indictment, and on August 18, 2015, a "Reindictment" was issued adding the bribery charge.   On August 25, 2015, a plea of not guilty was entered by the court on the bribery charge.

{¶ 3} The bench trial began on November 16, 2015.   Kathleen Ely testified that she is the niece of Willa and William Stamback, the victims herein.   She stated that the Stambacks had known each other since first grade, and that they lived in Phillipsburg their entire lives.   Ely stated that Willa passed away on Memorial Day Weekend of 2013, and that William died around the following Fourth of July.   She stated that they were both in their eighties when they died.

{¶ 4} Ely testified that she was very close to Willa, who was Ely's mother's sister. She stated that the Stambacks gave her their power of attorney ("p.o.a.") for finances in

2004. Ely stated that at the time William had Parkinson's disease, and that Willa was born with cerebral palsy that affected her hands and ability to walk, but that they were still living independently. Ely stated that by 2010 the Stambacks began to need extra help, and that she eventually went to their home every Saturday, and also ran errands for them and took them to their appointments. She stated that both of the Stambacks continued to drive until the end of 2011 or the beginning of 2012, and that they owned a Chevy Cobalt.

{¶ 5} Ely stated that as William's health deteriorated, she arranged for Hospice of Miami Valley care to come to the home. She testified that Willa began falling down and hospice staff advised Ely that they did not want to be responsible for Willa. Ely stated that she contracted with Right at Home on November 7, 2012 to come every day for six to eight hours a day, having been referred to them by Michael Manes of hospice. She identified State's Exhibit 23 as the contract she signed with Right at Home. She stated that she paid the initial deposit of $1,365.00 from the Stambacks' checking account, with an account number ending in 4480. Ely identified State's Exhibit 5 as the check she signed on the account, and the check bears the Stambacks' name as well as "Kathleen Ely POA." Ely stated that she also began paying the Stambacks' bills at their home from the same account, such as medical bills, Vectren and DP&L, since William was having trouble writing. Ely stated that she also withdrew cash from the account for the Stambacks, and that Right at Home "had to have cash because they were taking [William] to the hospital every day to visit [Willa]. There had to be cash there for groceries and food." She stated that Willa wanted her to cash her monthly Social Security checks for her in an amount around $300.00. Ely identified State's Exhibit 50 as her signature card

as p.o.a. for the Stambacks' account at Chase Bank ending in 4480, dated June 2, 2012. Ely stated that at the end of December 2012, the Stambacks' account balance was $69,000.00.

{¶ 6} Ely stated that Marcum was employed by Right at Home and that she initially met her when Marcum brought William to the hospital to visit Willa. She stated that Marcum was "very friendly and attentive" to William. Ely stated that in January 2013, she was contacted by a Chase Bank employee, and as a result, she left work, went to the bank to get money for William, and then went to William's home. She stated that when she arrived William was in bed and "very agitated and mad" and "accusing me of all kinds of things." Ely stated that William told her that she was no longer his p.o.a. Ely stated that Marcum was "hysterical," and that Marcum indicated that she and William were going to see William's attorney. Ely stated that she left the house immediately. She stated that she did not write any more checks on the Stambacks' account or remove any additional cash after that day. Ely identified State's Exhibits 7 and 8 as two Notices of Revocation of Durable Power of Attorney that she received, one signed by William on January 16, 2013, and one signed by Willa on February 20, 2013.. Ely stated that she was aware that the Stambacks had wills, but she did not know who their beneficiaries were.

{¶ 7} On cross-examination, Ely stated that she wrote checks for the Stambacks from 2010 to 2013. She identified as Defendant's Exhibit S a January 16, 2013 check, written by her on the Stambacks' account ending in 4480, for cash in the amount of $300.00, and she testified that January 16, 2013 was the day she was contacted by the Chase employee. Ely stated that the Chase employee told her that William, a woman, and another man had come into the bank for money, and that she then went to the bank

to get money for William, which she took to his home. She stated that when she left the Stambacks' residence that day, she and William were on bad terms. Ely stated that she phoned the Stambacks' attorney, James Treherne, after she left that day about the argument. She noted that Treherne notarized State's Exhibits 7 and 8, the p.o.a. revocations.

{¶ 8} Ely stated that William was very unhappy when Willa was in the hospital, and that she did not try to arrange for Willa to come home because Good Samaritan Hospital personnel indicated that they would not release her. She stated that she understood that Willa was subsequently transferred to and released by Kindred Hospital after Ely no longer had the Stambacks' p.o.a. On redirect examination, Ely stated that all of the checks she wrote on the Stambacks' account were for the Stambacks' benefit.

{¶ 9} Michael Manes testified that he is the owner and chief executive officer of Right at Home. He stated that his employees and independent contractors are "not allowed to handle any type of cash whatsoever of the customers." Manes stated that he was contacted by Ely in November of 2012, and that he was present at the initial assessment of the Stambacks at their home. Manes testified that the Stambacks were very passionate about remaining in their home. He stated that Marcum began working part-time at Right at Home at the end of 2009, and that she became a subcontractor with the company in 2011. He testified that she was a State Tested Nurses' Aide. Manes stated that Marcum was one of the caregivers he assigned to care for the Stambacks. He stated that he "originally called her and asked her if she was interested because it was nearby and she said yes." Manes stated that Marcum's first day of work was November 28, 2012. He identified as State's Exhibit 24 a printout from Right at Home's scheduling

software reflecting the Right at Home caregivers' schedules at the Stambacks' home. The schedule reflects that March 5, 2013 was Marcum's last day as a Right at Home caregiver.

**{¶ 10}** Manes stated that he became concerned when Ely was removed as p.o.a. because the Stambacks "were very ill." He stated that he introduced William to a financial planner for help with his finances, but that William declined the services. Manes stated that in early March of 2013, Marcum "came up to my office and presented me with notarized power of attorney paperwork for both the Stambacks for medical and financial." He stated that he "told her that was highly irregular and she agreed and stated that * * * they don't have anybody else, nobody else is willing to step up. And honestly, I cautioned her. * * * We parted ways after that." Manes identified as State's Exhibits 9 and 10 the papers designating Marcum as William's and Willa's p.o.a. Manes stated that he believed Marcum also informed him that the Stambacks "were going to put her in their will." Manes stated that such a situation had never happened with any other caregiver, and that to "me it was a complete conflict of interest," since "you can't directly care for somebody, * * * and expect to be compensated but then have complete and total control over their finances." Manes stated that Marcum never worked for him as a caregiver after March 2013, and that Right at Home ceased providing services to the Stambacks "quickly on my direction."

**{¶ 11}** James Treherne testified that he is a probate attorney, and that the Stambacks were his clients. He stated that he drafted three sets of wills for them. Treherne identified State's Exhibit 15 as a January 1985 will and an April 1986 codicil he drafted for Willa, and State's Exhibit 16 as a January 1985 will and a November 1986 codicil he drafted for William. Treherne testified that pursuant to the wills, upon the death

of either Stamback, their estate would pass to the surviving spouse. In the event of the surviving spouse's death, the estate would go to Willa's nieces and nephews and to William's sister. Treherne stated that he drafted the joint p.o.a. in favor of Ely for the Stambacks in 2004, which he identified as State's Exhibit 34.

**{¶ 12}** Treherne testified that the 1985 wills were revoked around January or February of 2013, after Marcum brought William to his office in early 2013. Treherne testified that "William and Willa were very very close, probably two of the closest husband and wives I've ever known. And the important thing to him was that he remain with his wife. She was in the hospital at the time on some sort of a machine. And they wanted to be together at home." Treherne testified that he discussed changing the wills and the p.o.a. with William in Marcum's presence, as well as naming Marcum the Stambacks' beneficiary. He stated that he drafted revocations of Ely's p.o.a. for William on January 16, 2013, and for Willa on February 20, 2013, which he identified as State's Exhibits 7 and 8. He stated that the dates on the revocations were different because he had to go to the hospital to obtain Willa's signature. Treherne stated that Marcum was then designated the p.o.a. for the Stambacks, and he identified State's Exhibit 9 as William's p.o.a. designation in favor of Marcum, and State's Exhibit 10 as Willa's p.o.a. designation in favor of Marcum. Treherne testified that he drafted new wills for the Stambacks in February 2013, which he identified as State's Exhibit 17 for William and State's Exhibit 18 for Willa. In each will Marcum is named as the contingent beneficiary following the death of the surviving spouse.

**{¶ 13}** Treherne stated that at the end April of 2013, Scott Schaurer, William's nephew, was appointed p.o.a. for the Stambacks. He stated that he received a phone

call from William, who was admitted to the hospital at the time, and that William told him, "my caretaker is in jail." Treherne stated that he went to see William at Kindred Hospital, and that Willa was also admitted there. He stated that Schaurer was present. Treherne testified that he felt that William was competent at the time, and that William wanted to change his and Willa's p.o.a. designations and revoke their wills. Treherne identified State's Exhibit 11 as the revocation of William's p.o.a. in favor of Marcum, and State's Exhibit 12 as the revocation of Willa's p.o.a. in favor of Marcum that he drafted for the Stambacks, both dated April 22, 2013. Treherne stated that William was right-handed but signed the revocation with his left hand because his right hand was in a cast, and that Treherne wrote "signed left-handed" on the document. He stated that Willa was "back on the machine that I first saw her on," and that he "had her sign an 'X' and put down that it was her mark and notarized it." Treherne stated that he "could still communicate with" Willa, and he understood from her that she wanted to revoke Marcum's p.o.a.

**{¶ 14}** Treherne identified State's Exhibit 19 as the new will that he drafted for William, and State's Exhibit 20 as the new will he drafted for Willa, both dated April 22, 2013. He testified that each will leaves the Stambacks' estate to the surviving spouse of the couple, with the residuary estate going to Willa's nieces and nephews after the surviving spouse's death. Treherne stated that the Stambacks signed the wills as they did the p.o.a. revocations in his presence. Treherne also identified State's Exhibit 13 as the document he drafted designating Schaurer as William's p.o.a. and Exhibit 14 as the document he drafted designating Schaurer as Willa's p.o.a., both of which Willa signed with an "X" and William signed left-handed on April 22, 2013. He stated that he mailed the revocations of Marcum's powers of attorney to the Stambacks' home since he

"assumed that she was still there," and that he gave Schaurer "a copy to take to the bank." Treherne stated that he did not draft any other wills or powers of attorney for the Stambacks, and that the wills of April 22, 2013 accurately reflect their wishes at the time.

{¶ 15} Treherne was shown State's Exhibit 21, a notarized document entitled "Addendum to My Will," dated March 3, 2013, bearing Willa's signature, and State's Exhibit 22, a notarized document entitled "Addendum to My Will," dated March 3, 2013, bearing William's signature, and asked if he drafted the documents. Treherne stated that he did not draft the documents, and that "we don't have addendums to wills," and "we don't notarize wills in Ohio." He stated that the addendums "don't reflect what [the Stambacks] told me to do in their wills."

{¶ 16} On cross examination, Treherne stated that he did not "handle either estate" of the Stambacks, and that "Gary Weaks was the one that was doing it." Treherne stated that he is aware that the wills he prepared in April of 2013 have never been presented to probate. When asked if "the only will that's been approved for Probate * * * is the one that you did in February of 2013," Treherne responded, "I think that's true." He stated that he did not know that on April 19, 20, 21 and 22, 2013 that William was being examined at the hospital for hallucinations and confusion. Treherne stated, "[w]hen I went in to see him he recognized me. We talked. We had some common interests that we usually talked about when we were together and then we * * * went on to signing wills and the other documents." Treherne stated that he was not aware that William was declared legally incompetent after April 22, 2013, and he stated that "even people who are declared incompetent have period[s] of lucidity." Treherne stated that he did not observe Marcum exercising undue influence over William in his office, and that "what [Marcum] proposed

to do was exactly what [William] wanted," namely to bring Willa home from the hospital. He stated that Marcum "took the necessary training to do that, to run that machine in their house," and that Willa was released from the hospital as a result.

{¶ 17} On redirect examination, Treherne stated that "it didn't seem correct" that the final April 2013 wills were never filed and that the February 2013 wills were filed. In response to questions from the court, Treherne stated that he was contacted by telephone by William about the April wills about a week before they were executed in the hospital.

{¶ 18} Crystal Alexander testified that she is the branch manager of Chase Bank in Phillipsburg. She stated that she knew William, and that he came to the bank frequently until he was physically unable to do so. She stated that "for the last several years he had * * * a niece as his power of attorney and she would do transactions for him." Alexander stated that the Stambacks' account ending in 4480 was opened on December 9, 1985, and that she is familiar with Ely as their p.o.a. Alexander stated that Ely typically "would come in and cash a check. William liked to have cash on hand at home. So she would bring a check in, written for cash, and cash the check and get certain denominations that they wanted." She stated that Ely would "cash a check between 3- and 500 usually once a month."

{¶ 19} Alexander identified State's Exhibit 51 as a signature card reflecting Marcum's p.o.a. on the Stambacks' checking account ending in 4480, dated March 15, 2013. She stated that once Marcum obtained the p.o.a., she had access to and control over the account, and that she could make withdrawals and conduct transactions on line. Alexander identified the following checks bearing Marcum's signature drawn on the account ending in 4480: State's Exhibit 52, a check written for cash, in the amount of

$1,000.00, that posted to the account on April 4, 2013; State's Exhibit 53, a check made out to Gary Williams in the amount of $550.00, with "repairs to" written on the memo line, followed by an illegible word, that posted to the account on April 15, 2013; and State's Exhibit 54, a check written for cash, in the amount of $1,000.00, with "Willa wants cash" written on the memo line, that posted to the account on April 15, 2013   Alexander identified State's Exhibit 55 as a check made out to Marcum, in the amount of $1,200.00, which posted to the account on April 30, 2013, reflecting William's signature. On the memo line of the check, "6 day's caregivers pay" is written.   Alexander stated that in comparison to the amounts of cash withdrawals executed by Ely, those executed by Marcum were "[w]ay out of the ordinary" and "[m]uch higher."

{¶ 20} Alexander next identified the following checks drawn on the Stambacks' account ending in 4480: State's Exhibit 25, a check reflecting William's and Marcum's signatures, made out to Melanie Vance, dated March 17, 2013, in the amount of $500.00, with "caregiver 60 hours 3/12, 3/13, 3/17" written on the memo line, that posted to the account on March 18, 2013; State's Exhibit 26, a check reflecting William's and Marcum's signatures, made out to Melanie Vance, dated March 21, 2013, in the amount of $213.00, that posted to the account on March 21, 2013; State's Exhibit 27, a check reflecting William's and Marcum's signatures, made out to Katherine Wiggins, dated March 29, 2013, in the amount of $300.00, that posted to the account on April 2, 2013; State's Exhibit 28, a check reflecting Marcum's signature, made out to Katherine Wiggins, in the amount of $1,400.00, that posted to the account on April 8, 2013; State's Exhibit 29, a check reflecting Marcum's signature, made out to Katherine Wiggins, in the amount of $270.00, that is dated April 15, 2013, and that was returned unpaid; State's Exhibit 40, a check

reflecting William's and Marcum's signatures, made out to Brandon Mitchell, in the amount of $675.00, that posted to the account on March 21, 2013, with "3/11 – 3/16 fixing the car and garage door etc." on the memo line; State's Exhibit 41, a check reflecting William's and Marcum's signatures, made out to Brandon Mitchell, in the amount of $63.71, that posted to the account on March 26, 2013, with "groceries on 3/25" on the memo line; State's Exhibit 42, a check reflecting Marcum's signature, made out to Brandon Mitchell, in the amount of $880.00, that posted to the account on April 8, 2013, with "garage cleanup roof repair" written on the memo line; State's Exhibit 43, a check reflecting Marcum's signature, made out to Brandon Mitchell, in the amount of $1,200.00, that posted to the account on April 15, 2013, with "caregiver 6/24 hr. days" written on the memo line; State's Exhibit 35, a check reflecting William's and Marcum's signatures, made out to Jill McConnell, in the amount of $600.00, dated April 17, 2013, with "caregiver 4 days" on the memo line, that did not post to the account; State's Exhibit 36, a check reflecting William's and Marcum's signatures, made out to Jill McConnell, also dated April 17, 2013, in the amount of $1,200.00 dollars, with "caregiver 6 days" on the memo line, that posted to the account on April 25, 2013; and State's Exhibit 38, a check reflecting William's signature, made out to Gregory Graley, in the amount of $636.42, with "car repair" written on the memo line, that posted to the account on April 26, 2013.

{¶ 21} Alexander stated that Chase Bank also processes electronic checks against customer accounts from, for example, Walmart. She stated that the following electronic checks, as reflected on State's Exhibit 59, a statement for the account ending in 4480, and State's Exhibit 57, a transaction history for the account, were paid from the Stambacks' account ending in 4480: a check made out to "Cato" in the amount of $206.33

that was paid on April 16, 2013; a check made out to "Cato" in the amount of $300.38 that was paid on April 10, 2013; a check made out to Wal-Mart in the amount of $286.36 that was paid on April 16, 2013; and a check made out to Wal-Mart in the amount of $104.57 that posted to the account on April 17, 2013.

**{¶ 22}** Alexander identified State's Exhibit 58 as a statement from the Stambacks' checking account ending in 4480 from March 23 – April 22, 2013, which lists Marcum as the p.o.a. and which reflects that on March 26, 2013, $250.00 was transferred into the checking account via online banking; on March 28, 2013, $380.00 was transferred into the account via online banking; on March 29, 2013, $1,600.00 was transferred into the account via online banking; on April 8, 2013, $1,200.00 was transferred into the account via online banking; on April 11, 2013, $2,500.0 was transferred into the account via online banking; and on April 15, 2013, $2,500.00 was transferred into the account. All of the transfers were from a savings account ending in 3217.

**{¶ 23}** Alexander identified State's Exhibit 96 as a transaction history for a savings account in William's name ending in 5272 from January 25, 2012 to February 4, 2013. She stated that in January, 2012, the balance was $60,929.25, and in October, 2012 it was $61,023.14. She identified State's Exhibit 97 as a transaction history for the savings account ending in 5272 from February 5, 2013 to March 5, 2013, and she testified that the ending balance is zero in the account.

**{¶ 24}** Alexander identified State's Exhibit 56 as the signature card reflecting Scott Schaurer as the Stambacks' p.o.a., dated April 26, 2013. Alexander stated that a Chase customer may order checks personally from the bank or from Deluxe Corporation online on the bank's website. She identified State's Exhibit 78 as a stipulated exhibit reflecting

January 30, 2015 correspondence from Deluxe Corporation to the prosecutor indicating that an online order for checks on the Stambacks' checking account ending in 4480 was placed on April 22, 2013, in William's, Willa's, and Marcum's names, to be sent to Marcum at 410 Snyder Road in Dayton, and that Marcum requested overnight shipping. Alexander stated that Scott Schaurer contacted her after the date of the order "because checks were written off the account that he did not write and they * * * appeared to be signed by Lisa Marcum. He wanted to know how she got the checks and when we checked into it, we found that there were checks ordered on line."

{¶ 25} Alexander stated that Schaurer subsequently closed the checking account ending in 4480, and she identified State's 57 as a transaction history reflecting a transfer on April 26, 2013, of $3,503.50, from the account ending in 4480 into a new account ending in 3639. Alexander identified State's Exhibit 60 as the April 26, 2013 signature card for William and Willa on the account ending in 3639, signed by Schaurer as p.o.a. Alexander identified State's Exhibit 64 as a transaction history from May 1, 2013 to May 21, 2013 for the account ending in 3639, which she stated reflects that a check order was charged to the account on May 7, 2013 in two amounts, namely $18.95, and $59.40. The prosecutor presented State's Exhibit 79 to Alexander, a stipulated exhibit reflecting January 30, 2015 correspondence from Deluxe Corporation to the prosecutor which provides that on May 2, 2013, checks were ordered online for the checking account ending in 3639, in William's name, to be sent to William at 420 N. Snyder Road in Dayton. Alexander testified that State's Exhibit 64, the transaction history for the account ending in 3639 reflects debits to the account in the amounts of $18.95 and $59.40 for the checks, and she stated that $18.95 is a typical price for checks, but that "$59.40 is not typical."

She stated that the "number is so high when they usually request next day shipping." Alexander stated that Marcum was never a signatory on the account ending in 3639.

{¶ 26} Alexander identified State's Exhibit 61 as a check dated May 3, 2013, on the account ending in 3639, made out to Melissa Gillette in the amount of $1,580.00, with "caregiver 2 wks 14 days" written on the memo line, reflecting William's signature on the check. Alexander identified State's Exhibit 64 as a transaction history for the account ending in 3639, and she stated that it reflects that the check was presented on May 6, 2013. Alexander stated that Exhibit 64 contains a "question mark" beside State's Exhibit 61 "which usually means that it's being reviewed to be returned."

{¶ 27} Alexander stated that after the May 2, 2013 check order, Schaurer closed the account ending in 3639 and opened another account for William and Willa, ending in 8128, on May 4, 2013, as their p.o.a. She stated that Schaurer transferred the balance from the account ending in 3639 into the account ending in 8128, and she identified State's Exhibit 65 as Schaurer's May 4, 2013 signature card as p.o.a. on the account ending in 8128, as well as State's Exhibit 66, a transaction history reflecting a transfer on May 6, 2013, from the account ending in 3639 to the account ending in 8128, in the amount of $15,850.60.

{¶ 28} Alexander identified State's Exhibit 72 as a signature card for an estate account ending in 0731 in the name of "Estate of William W. Stamback Lisa R. Marcum Exec," signed by Marcum on August 10, 2013 at the Wright Dunbar branch of Chase Bank. She identified State's Exhibit 71 as a checking summary for the estate account that reflects a deposit into the account on August 12, 2013 in the amount of $3,409.00. Alexander testified that State's Exhibit 67, a transaction summary for the account ending

in 8128, reflects that there was a withdrawal from the account ending in 8128 on August 10, 2013 for $4,909.63. Alexander identified State's Exhibit 68 as a withdrawal ticket in that amount signed by Marcum. Alexander identified State's Exhibit 69 as a deposit ticket reflecting that $3,409.63 was deposited into the account ending in 0731.

{¶ 29} Alexander identified State's Exhibits 73-75 as three "counter checks" made out to cash on the estate account ending in 0731 and signed by Marcum as executor. She stated that Exhibit 73 is dated August 12, 2013, in the amount of $1,100.00; Exhibit 74 is dated August 16, 2013, in the amount of $1,300.00; and Exhibit 75 is dated August 22, 2013, in the amount of $860.00. Alexander identified State's Exhibit 76 as a check made out to Clayton Pet Hotel and Spa, on the estate account, dated September 27, 2013, signed by Marcum, in the amount of $17.25, as well State's Exhibit 77 as a check on the estate account made out to Dragon City, dated December 28, 2013, signed by Marcum, in the amount of $50.00.

{¶ 30} On cross-examination, Alexander testified that pursuant to bank policy, the bank's legal department determines the validity of a p.o.a. presented at the bank. She acknowledged that State's Exhibit 13, the p.o.a. in favor of Schaurer from William contains two different dates, and that William's signature thereon is illegible. She stated that the signature on the p.o.a. in favor of Schaurer from Willa in Exhibit 14 "looks like a little shaky X to me," and that there is a discrepancy in the dates thereon. Alexander testified that the legal department did not question the powers of attorney in favor of Schaurer. She stated that Schaurer "came into the bank and told me that Mr. Stamback had revoked the power of attorney for Lisa Marcum." She stated that Schaurer signed the signature card on the Stambacks' account ending in 4480 on April 26, 2013. Alexander stated that the

bank did not notify Marcum of the change, but that there are "notations made on the account so that when you pull up the account on the screen you see that there's a notation by the legal department that that power of attorney had been revoked." Alexander stated that she does not know if the estate account ending in 0731 is still open.

{¶ 31} Kathryn Harkenrider testified that she is a registered nurse at Hospice of Miami Valley, and that she previously worked at Heartland Hospice. She stated that while at Heartland, she cared for the Stambacks. She stated that Marcum "called in and requested the hospice referral for the Stambacks," and that she performed William's and Willa's initial assessments around March or April of 2013 at the Stambacks' residence. She stated that Willa was in end-stage respiratory failure, "vent dependent" and on a feeding tube, and that William "had an extensive cardiac background," had a pacemaker, and required oxygen at rest.

{¶ 32} Harkenrider stated that upon arrival at the Stambacks' residence, she introduced herself "as the admitting RN and [Marcum] introduced herself as the daughter of the Stambacks." She stated that Marcum advised her that she held the Stambacks' powers of attorney, but that "she did not provide the power of attorney paperwork that I needed in order to admit them. So, Mr. Stamback is the one that signed the consents." She stated that William was "alert and oriented" at the time." Harkenrider stated that Willa "appeared to be alert and oriented because when I would ask her questions, like, about her pain or about her needs, she was able to mouth words. * * * And she could also squeeze your hand yes or squeeze your hand no."

{¶ 33} When asked about her observations of Marcum at the time, Harkenrider stated that "we like for the family to be present" at the assessment, but that Marcum, in

her pajamas, "was just popping in and out, but most of the time she was in the back bedroom." She testified that Marcum made a TV dinner for William, but that she "didn't see any medical care given." Harkenrider stated that something "didn't feel right about the situation about her being in her pajamas going back and forth, saying that she was their daughter but we weren't really sure." She stated that she relayed her concerns to her administrator on the night of the assessment.

{¶ 34} Harkenrider stated that she provided care for the Stambacks in their home at least ten times. She stated that hospice personnel often went "between eight and midnight to do a night tuck" based upon concerns about Willa's care. Harkenrider testified that "we would go and Willa's feeding tube would be turned off. And that's not good because she's on a continuous tube feed." She testified that Marcum's daughter, Christina Wiggins, was present in the home and that she had to educate her and Marcum about the feeding tube. Harkenrider testified that on more than one occasion she was called to the residence because the "inner cannula" of Willa's tracheotomy "was completely out. And this is something that has to be physically turned to take out the cannula." She stated that Willa would have been unable to remove it herself, and "it was very odd that it was out." She testified that "Rencare," the "trach company," arranged to teach Marcum and her daughter how to care for Willa's tracheotomy, "but when they came out on several occasions, they indicated that Lisa never came to the teachings on how to give proper trach care." Harkenrider testified that Christina Wiggins' boyfriend, Brandon Mitchell, was also "in the back bedrooms [and] * * * he was just in and out." She stated that no work was being performed at the home such as roof or car repair by Mitchell when she was in the home.

{¶ 35} Harkenrider testified that after being contacted by Katherine Wiggins regarding the Stambacks, she called the Phillipsburg Police Department. She stated that she was then referred to the Montgomery County Sheriff and filed a police report based upon what Katherine Wiggins reported. Harkenrider stated that "we went from routine level of care to continuous care which is where they have [a] nurse at the bedside 24/7. And we did that because we wanted to make sure that [the Stambacks] were safe." She stated that this change of care occurred in April of 2013.

{¶ 36} On cross-examination, Harkenrider testified that the Stambacks were adamant that they wanted to remain at home. She stated that there "was a call that came into the Phillipsburg Police Department," and "[t]hey sent an officer out to check on them. When they got to house, the Stambacks were there alone." At that time, according to Harkenrider, Heartland removed Willa from the home and placed her in the hospital. She stated that the decision was made to remove Willa based upon the issues with the cannula and the feeding tube, and the fact that the Stambacks were left alone with no one to care for them. Harkenrider testified that William wanted to have Willa brought back home.

{¶ 37} Melanie Ryan testified that her maiden name is Vance and she is a nonmedical in-home support provider for the elderly at Visiting Angels. Ryan stated that she was contacted by Marcum after Ryan placed her resume on Craigslist. Ryan stated that she met with Marcum in late fall of 2012 and agreed to provide care for the Stambacks. She stated that when she was in the residence, Christina Wiggins "was there the most. [Marcum] came and went. Hospice also came and went." Ryan stated that she worked three 24 hour shifts a week and was paid $500.00, or $166.66 per 24

hour shift, which was the "going rate." Ryan stated that she was paid by Marcum by check.

**{¶ 38}** Ryan testified that she never observed Brandon perform roof or car repair at the residence or provide care to the Stambacks. Ryan stated that she was aware that the Stambacks owned a car because William "inquired about its whereabouts." She testified that she observed Christina Wiggins and Marcum using the vehicle. She identified Exhibits 25 and 26 as checks that she received in March of 2013, signed by William and Marcum. When asked why she worked for such a short time for the Stambacks, she stated that "things * * * weren't really going the way that they normally go on a normal job. There was a lot of people kind of there." When asked if William ever mistreated Willa, Ryan responded, "[e]very night he told her he loved her and that she was his girl. And he slept in a chair just to be near her."

**{¶ 39}** Scott Schaurer testified that he is a maintenance consultant currently located in Houston Texas. He stated that he used to live in Arcanum, and that Willa was his father's sister. He stated that growing up, Willa and William "were like a second set of grandparents which also lived in town," and that he saw them often.

**{¶ 40}** Schaurer testified that Ely was the Stambacks' p.o.a. in 2012, and that "she would keep me up to date on things if I wasn't there because I did travel a lot for work." Schaurer testified that he was unaware that he was a beneficiary of the Stambacks' 1985 wills. Schaurer testified that he was aware that Right at Home began providing healthcare for the Stambacks, and that he became aware of Marcum. Schaurer testified that he would visit the Stambacks for 30 to 40 minutes at a time when he stopped by on weekends, and that he observed Right at Home workers there. He stated that he learned that Ely had been withdrawn as p.o.a.

**{¶ 41}** Schaurer stated that in April of 2013, he stopped by to visit the Stambacks, and Willa had been removed and the police were present. He stated that William was lucid and had just come home from the hospital and wanted to know where Willa was. After speaking to William, Schaurer learned that Marcum was in jail and "wouldn't be able to return to the house right away." He stated that a representative from Adult Protective Services was also present. Schaurer stated that there was a disconnect notice from DP&L and other unpaid bills in the home. Schaurer stated that William asked him to be his p.o.a. to take care of paying their bills, and that he phoned Treherne. Schaurer identified State's Exhibits 13 and 14, William's and Willa's grants of p.o.a. in his favor, and he indicated that he received them within a day or two of April 22, 2013.

**{¶ 42}** Schaurer stated that he took the powers of attorney to Chase Bank in Phillipsburg and became a signatory on the Stambacks' account ending in 4480 on April 26, 2013. He stated that he did not confer authority on Marcum to continue signing on the account. When shown State's Exhibit 78, Schaurer stated that he did not authorize checks bearing William's, Willa's, and Marcum's name to be shipped to 410 Snyder Road. Schaurer testified that he does on line banking, and that he did not change the log in information or password for the account ending in 4480. He stated that when he learned from the bank that the account was frozen due to "questionable transactions," he transferred the money therein to the account ending in 3639, and he stated that he recognized State's Exhibit 60 as his signature card thereon, dated April 26, 2013. He stated that Marcum was not an authorized signatory on the account ending in 3639. When shown State's Exhibit 79, Schaurer stated that he did not authorize Marcum to order checks in William's name to be shipped to 420 Snyder Road.

**{¶ 43}** When shown Exhibit 61, the May 3, 2013 cancelled check from the 3639 account made out to Melissa Gillette, Schaurer stated that he does not know Gillette and did not authorize her to have money from the account. Schaurer testified that William was in a nursing home at the time the check was written. Schaurer testified that he then opened another account, and he testified that he recognized State's Exhibit 65 as his May 4, 3013 signature card for the account ending in 8128.

**{¶ 44}** Schaurer testified that after William died, he contacted Gary Weaks, an attorney, to represent the Stambacks' estate. He testified that after he obtained the original wills from Treherne, Weaks took them to the court to file them, and learned that another will had already been filed. Schaurer stated that he had healthcare bills in the amount of $33,000 for the Stambacks, as well as other bills, and that he learned that the debts of the estate equaled or exceeded the estate's assets.

**{¶ 45}** Schaurer testified that he learned from Ely that William and Willa had a life insurance policy with Ohio National Financial Services. He stated that after "lengthy investigation," beneficiaries thereto were eventually paid, and that he was one of them. Schaurer stated that he was familiar with William's and Willa's signatures, and when shown Exhibits 21 and 22, the addendums to William's and Willa's wills, Schaurer denied that William and Willa signed the addendums.

**{¶ 46}** When shown State's Exhibits 30 and 31, represented to be copies of both sides of a State of Ohio Certificate of Title for a 2008 Chevy Cobalt in Willa's name, and asked if he recognized the signature on the back thereof next to the printed name of Willa Stamback, Schaurer stated, "that does not look like my aunt's signature." When shown State's Exhibit 89, represented to be an Odometer Disclosure Statement for the car

bearing Willa's printed name and a signature, Schaurer stated, "[w]ithout question, that is not my aunt's signature." Schaurer stated that State's Exhibits 19 and 20, the wills drafted by Treherne on April 22, 2013, name him and other family members as beneficiaries. Finally, when shown Exhibit 55, a check made out to Marcum in the amount of $1,200.00 dated April 18, 2013, and asked if the signature thereon is William's, Schaurer responded, "[i]t doesn't look to be."

{¶ 47} On cross examination, Schaurer testified that William was admitted to Good Samaritan Hospital on April 19, 2013. He testified that hospital personnel advised him that "in order to keep [William] in the hospital and prevent him from signing himself out of the hospital, the only way they could do that was to declare him incompetent." Schaurer testified that William went from the hospital to a nursing home, and that Willa was with him there. He testified that State's Exhibit 13, the p.o.a. document executed by William on April 22, 2013, bears William's signature. Schaurer stated that he is aware that the Montgomery County Probate Court named Marcum the executor of William's estate, and that for financial reasons he chose not to contest the will appointing Marcum.

{¶ 48} Rebekah Jo Barber testified that she previously worked as a police officer in the Phillipsburg Police Department. Barber stated that she was working on April 19, 2013 as a police officer from 3:00 or 4:00 p.m. to between 1:00 and 2:00 a.m. She stated that she was dispatched to the Stambacks' home at 16 Walnut Street "on a criminal trespass." Barber stated that when she arrived, William, an Adult Protective Services representative, Schaurer, his wife, another caregiver, and another police officer were present. Barber stated that Marcum was not present but that she made contact with Marcum via telephone and met with her later in the day at the police department, along

with Marcum's daughter.

{¶ 49} Barber stated that Marcum and her daughter were trespassed from the Stambacks' home. She stated that Christina Wiggins and Marcum understood that "we were telling them not to reappear back on that property at 16 Walnut. And they signed the document[s]." Barber stated that she met with Marcum again around April 26, 2013, at the police department. Barber stated that Marcum asked "to come by and deliver documentation for checks that had been written that she had stated that other people had stolen from her, as well as other documentation such as the deed to the house and the [p.o.a.] paperwork." Barber stated that Marcum advised her that she had hired Right at Home to care for the Stambacks. She stated that she recognized State's Exhibit 23 as the Right at Home services agreement that Marcum presented to her on April 26, 2013, and Barber stated that she initially noted the agreement "wasn't even in Ms. Marcum's name. It was a Kathleen Ely * * * that signed it."

{¶ 50} Glen Hughes testified that he is a notary commissioned by the State of Ohio. He stated that he knows Marcum because he "used to own a grocery store and she used to come in with Gary Williams." Hughes stated that he used to notarize documents for Marcum once or twice a year, and that he notarized a car title for her on March 12, 2013. Hughes identified State's Exhibits 30 and 31 as the front and back of the certificate of title he notarized for Marcum. He stated that Willa was listed as the owner on the front of the title for a 2008 Chevy Cobalt, that the mileage was listed as 80, and that the purchase price was $15,956.45. Hughes stated that a portion of the back side of the certificate of title was already filled out when Marcum presented it to be notarized, namely the portion identifying Marcum as the buyer with an address of 16 Walnut Street,

a purchase price of $100.00, and Willa's printed name, signature and address. According to Hughes, Marcum also presented Willa's p.o.a. and signed the certificate of title in his presence. He stated that Marcum advised him that the car was a gift from a couple she provided healthcare for in Phillipsburg.

{¶ 51} Hughes stated that Marcum subsequently asked him to notarize a deed to a residence in Phillipsburg, and that he refused to do so because Marcum "had the power of attorney for one and not the other and it just didn't feel right. Something was wrong about it. It didn't look right to me." He stated that Marcum told him that the deed was a gift "for doing such a good job with home healthcare." He stated that he returned the deed to Marcum.

{¶ 52} Hughes stated that he also notarized an Odometer Disclosure Statement for Marcum on May 13, 2013, which he identified as State's Exhibit 89. He stated that Willa's name appears on the statement as the seller of the 2008 Chevy Cobalt, and that he remembered the car from the title he notarized.

{¶ 53} Marquis Sansom testified that he is the downtown supervisor for the Auto Title Division of the Montgomery County Clerk of Courts. He identified State's Exhibit 32 as a copy of Marcum's certificate of title for the Chevy Cobalt. He stated that the certificate of title was issued on April 20, 2013. Sansom testified that an issue arose with the odometer on the Cobalt, and he identified State's Exhibit 88 as Marcum's May 13, 2013 affidavit for the odometer on the vehicle, reflecting mileage of 33,981 miles. Sansom further identified State's Exhibit 89. Sansom identified State's Exhibit 98 as a record reflecting the current and previous owners of the Cobalt. He stated that the record reflects that Willa was the first purchaser of the car, and he stated that Marcum's name

next appears on the record, followed by CarMax Superstores, Inc. He stated that the record reflects that the car was transferred to CarMax on May 13, 2013.

{¶ 54} Jill McConnell testified that she resides in Kettering, does not work outside the home, and has a felony conviction for possession of heroin. She stated that Greg Graley is her former boyfriend. McConnell stated that she met Marcum through Graley. She stated that on the morning of April 23, 2013, she was at the home of one of Graley's friends when Graley woke her up in the morning and told her that he needed her to cash a $600.00 check made out by Marcum. McConnell stated that she took the check to a Check Smart location near Dayton with Marcum and Graley, and "they wouldn't cash the check because [Marcum] was the power of attorney and her name wasn't actually on the check." McConnell identified State's Exhibit 35 as the April 17, 2013 check on the account ending in 4480 in the Stambacks' name, made out to her. On the memo line, "Caregiver 4 days" is written, and McConnell testified that she is not a caregiver, and that she has never met the Stambacks. She stated that Marcum signed the check.

{¶ 55} McConnell testified that after she advised Marcum that she could not cash the check, Marcum drove McConnell to a residence where she retrieved her p.o.a. documentation. According to McConnell, they returned to the Check Smart location. McConnell stated that Marcum "went up with me and she was actually talking to the lady and * * * she gave her the paperwork and * * * it was approved for 1200. And so [Marcum] took the check and wrote out another one for the 1200 and then handed the check to the lady." McConnell identified State's Exhibit 36 as the check, dated April 17, 2013, that Marcum signed and presented for $1,200.00 on the Stambacks' account ending in 4480. On the memo line, "caregiver 6 days" is written. She stated that the check was cashed,

and that she gave all of the cash to Marcum when they returned to the car. She stated that Marcum gave her $100.00 and gave Graley some money and kept the rest. McConnell stated that the money she received was not for any work that she performed.

**{¶ 56}** Joseph Schweiterman testified that he is a Montgomery County deputy sheriff. He stated that on March 19 – 20, 2013, he was working in Phillipsburg, and that he responded to the Stambacks' home on a report of fraud called in by Marcum. He stated that when he arrived, Willa was in bed, William was sitting in a chair, and Marcum and Christina Wiggins were present. She stated that Marcum advised him that she used to work for a home healthcare company for the Stambacks but had grown close to the couple and "she was still there helping them out." He stated that Marcum provided a written statement, which he identified as State's Exhibit 87. The statement provides that the Stambacks' niece "was robbing them." He stated that Marcum indicated on the statement that her address is 410 Snyder Road. Schweiterman testified that he also responded to the Stambacks' address for a welfare check on April 10, 2013. He stated that upon arrival he initially made contact with an LPN who was there taking care of the Stambacks named Letrice, who advised him to speak to Harkenrider, her supervisor. Schweiterman stated that he proceeded to the Phillipsburg police station to meet Harkenrider, and that she provided a written statement. Schweiterman stated that he again responded to the Stambacks' address on April 16, 2013 after Willa was found alone in the home. Schweiterman stated that Brandon Mitchell was later found hiding in the bathroom of the home and arrested on two active warrants after Willa was taken to the hospital. On cross examination, Schweiterman stated that on March 19 -20, 2013, Marcum advised him that people were stealing money from the Stambacks, and that she

mentioned Tonja Driggs to him, who was a previous healthcare provider. He stated that he wrote a report and provided it to detectives to investigate Marcum's allegations.

{¶ 57} James Roy Combs, Jr. testified that he is unemployed, and that he "scraps" for money. He stated that he has been acquainted with Gary Williams for a long time, that Williams was married to Marcum, and that they lived on Snyder Road. He testified that he was asked to sign documents by Williams, and that Marcum presented documents for him to sign at the Snyder Road address. He identified State's Exhibits 21 and 22, the Addendums to Willa's and William's wills, and he stated that Marcum asked him to sign the documents as a witness and date them, and he identified his signatures thereon and stated that they were signed on March 3, 2013. Combs testified that he did not witness Willa and William sign the addendums. He stated that he did not witness the other signature on the addendums of witness Renee Frost. Combs identified as State's Exhibit 82 a change of beneficiary form that he signed and dated as a witness, that also bears William's signature, as well as that of Renee Frost, and he stated that he did not witness William's or Frost's signature thereon. Combs stated that Marcum advised him to date the document March 10, 2013.

{¶ 58} Gregory Scott Graley testified that he has three prior felony convictions for burglary, possession of drugs and having weapons while under disability, and that he is currently in custody on a pending matter. He stated that he became acquainted with Marcum through Marcum's daughter. Graley stated that Jill McConnell is his former girlfriend. Graley stated that in March of 2013, Marcum offered to give him a Chevy Cobalt. He stated that Marcum owed him around $2,000.00 at the time. Graley identified State's Exhibits 30 and 31 as the certificate of title to the Cobalt that Marcum

gave him. Graley stated that he took possession of the car and title, which he testified he valued at $7,000.00. Graley stated that he never filed the title. He testified that one night Marcum "got into a fight with a friend of hers out in front of my apartment," and that as a result, the Dayton Police towed the Cobalt. Graley stated that Marcum "came and got the title back from me, and got it out of tow." He stated that Marcum never returned the car to him.

{¶ 59} Graley stated that in April of 2013, Marcum contacted him and told him that she had some money for him. He stated that he met Marcum and that she gave him some checks, but that he "really wasn't interested in them." He testified that his ID had expired and he did not think he would be able to cash the checks. Graley stated that he, McConnell and Marcum then went to "the check-cashing place on Linden," at 11:00 p.m. or 12:00 a.m., and that a check made out to McConnell could not be cashed because Marcum lacked the p.o.a. paperwork. He stated that they returned to cash the check after Marcum retrieved the paperwork in Phillipsburg, and that McConnell cashed a check for $1,200.00. Graley stated that Marcum then handed him $1,000.00. He identified State's Exhibit 36 as the check that McConnell cashed on the Stambacks' account ending in 4480.

{¶ 60} Graley stated that the next day Marcum again contacted him and told him that she had more money. He stated that he met her "at the bar on Dixie," and she made a check out to him and signed it in his presence. Graley identified State's Exhibit 38 as the check he received from Marcum. The check is drawn on the Stambacks' account ending in 4480, in the amount of $636.42, and "car repair" is written on the memo line. Graley stated that he cashed it at a Check Smart on Needmore Road. He stated that

Marcum drove him there in the Cobalt. Graley testified that he does not know the Stambacks. Graley stated that he worked on the brakes and spark plugs of the Cobalt and changed the oil when he had possession the car, because he "drove it like crazy," but that he did not do any work on the car for the Stambacks.

{¶ 61} Katherine Wiggins testified that Marcum is her husband's ex-wife, and that she has known Marcum for 14 years. Wiggins testified that she has experience in home healthcare, and that in March of 2013, Marcum contacted her about an employment opportunity. Wiggins stated that she agreed to work at the Stambacks' residence for $100.00 for a 24-hour shift. She stated that when she went to the residence the first time to meet the Stambacks, Marcum described the work that was required, and that she worked her first shift a couple of days later. She stated that at the time, Marcum's daughter had a room in the back of the home "to make sure that somebody was there twenty-four seven."

{¶ 62} Katherine stated that she observed Brandon Mitchell at the residence a couple of times, and that she did not observe him providing healthcare to the Stambacks or performing roof or car repairs for them. Katherine identified State's Exhibits 27, 28, and 29 as checks she received for providing healthcare. State's Exhibit 27 is dated March 29, 2013, for $300.00; State's Exhibit 28 is dated April 7, 2013, for $1,400.00; and State's Exhibit 29 is dated April 15, 2013, in the amount of $270.00. All the checks are drawn on the Stambacks' account ending in 4480 and signed by Marcum as p.o.a. Katherine stated that the amount of $1,400.00 on State's Exhibit 28 represented money due to her and Christina Wiggins combined on one check, and that after she cashed it she paid Christina. Katherine stated that when she tried to cash State's Exhibit 29, a

"stop payment" had been placed on the check and she was unable to cash it. Katherine stated that Marcum advised her not to tell the Stambacks that she was being paid to care for them. She stated that she went to the Stambacks' home at least ten times, and that Marcum was more often absent than present. Katherine stated that she was concerned that Marcum was subjecting the Stambacks to financial abuse.

{¶ 63} Melissa Gillette testified that she has a felony record and is currently in custody on a probation revocation. She stated that she met Marcum and her daughter through friends in March of 2013. She stated that in April 2013, Marcum asked her to take care of the Stambacks. Gillette stated that she has no healthcare training. She stated that she agreed to do it. Gillette stated that Marcum also told her she held the Stambacks' powers of attorney, and that she "was going to be the beneficiary of their estate, their house, their assets." Gillette testified that she observed Christina Wiggins at the residence and that Marcum told her she was staying there. She stated that she also observed Christina's boyfriend Brandon Mitchell there.

{¶ 64} Gillette testified that she was in the Stambacks' home for two hours, and that she was told to "sit and listen and make sure none of the machines went off, any alarms went off or sounds from the machines." She stated that she was told to call Marcum, and not 911, if an alarm sounded. Gillette stated that she was told "I was to be paid $10 an hour and I was told that I would be paid for a full eight hours." She stated that when Marcum returned to the home, she drove Gillette home without paying her. Gillette stated that the same scenario occurred a second time, for about two hours. She stated that Marcum again did not pay her.

{¶ 65} Gillette stated that Marcum called her on May 3, 2013 and asked her if she

"had a valid ID or if I owed the check cashing places any money." After telling Marcum that she did have a valid ID and did not owe any money, Gillette testified that Marcum "told me if I cashed a check for her, that not only would I be paid the money she owed me but she would pay me for cashing the check." She stated that Marcum then drove to Check N Go on North Main Street. She stated that Marcum wrote a check in her presence, and she identified State's Exhibit 61 as the check in the amount of $1,580.00, dated May 3, 2013, that appears to be signed by "William W. Stamback" on the Stambacks' account ending in 3639. "Caregiver 2 wks 14 days" is written on the memo line. Gillette stated that she did not provide care for two weeks or 14 days. There is a handwritten phone number at the top of the check, namely (937) 542-9090, and Gillette testified that Marcum wrote the number, and that it is Marcum's phone number. Gillette stated that she observed Marcum write William's signature on the check, and that no one else was present at the time. Gillette stated that when she returned to the car with the cash, she gave it to Marcum, and Marcum gave her $300.00 and drove her home.

{¶ 66} Gillette stated that she was scheduled to testify against Marcum at an earlier trial date, and that she was arrested shortly before the trial was to begin on a probation violation and held in the Montgomery County Jail. She stated that she provided testimony via deposition. Gillette stated that while she was in jail, on May 17, 2015, Marcum came to visit her. She stated that she spoke to Marcum over a phone through a glass window. Gillette stated that Marcum knew she was scheduled to testify against her at her trial, and that Marcum "asked me to testify that I had worked for two weeks." Gillette testified that she told Marcum "that I had already given my testimony that I had worked for two days." Gillette stated that Marcum "said that she needed me to talk

with her attorney," and that "she would send him to speak with me." According to Gillette, Marcum "told me that she would put a hundred dollars on my books," or commissary account at the jail. She identified State's Exhibit 85 as a record of her commissary account, and she testified that it reflects that Byron Boykin deposited $100.00 to the account on May 17, 2015.

{¶ 67} Renee Hensley testified that she is employed by Hospice of Dayton, and that she was formerly known as Renee Frost. Hensley stated that Marcum was a friend whom she has known since 1997. Hensley stated that Marcum contacted her in March of 2013 and said that she "needed a signature for somebody that was not a family member." Hensley stated that Marcum asked her and her daughter "to come out and help care for some people that she was caring for but neither one of us did." Hensley stated that she and Marcum sent text messages to each other, and that she recently provided the messages to law enforcement. Hensley identified State's Exhibit 91 as an accurate copy of the messages between her and Marcum. She stated that the messages were about a signature. When shown State's Exhibit 21, the addendum to Willa Stamback's will, which contains the signature of "Renee Frost," dated March 3, 2013, Hensley stated, "[i]t resembles my signature but it's not." She stated that she was not using the last name Frost at the time, and that she did not sign the document or witness the other signatures thereon. When shown State's Exhibit 22, the addendum to William's will, which also contains the signature of "Renee Frost," dated March 3, 2013, Hensley stated that she did not sign the document or witness the other signatures thereon. Finally, when shown State's Exhibit 82, the "Change of Beneficiary" form for William's life insurance policy designating Marcum as the sole beneficiary of the policy following Willa's death, which

reflects the signature of "Renee Frost," dated March 10, 2013, Hensley stated that she did not sign the document or witness the other signatures thereon.

{¶ 68} Hensley testified that in text message number 6 on State's Exhibit 91, Marcum sent her a picture of Hensley's "signature," and that in text message number 16, she sent a photograph of the front of the home of "the people where she was taking care of." (Sic). Hensley stated that she has never been to the home or met the Stambacks. She stated that she received the pictures on October 25, 2013. When asked why the pictures were sent to her phone, Hensley replied, "I guess so I could say that I did it. I mean, that I had been there and that was the signature that was signed." When asked if Marcum subsequently spoke to her about the signatures, Hensley stated that Marcum said "she was sorry. That she didn't mean to drag me into this."

{¶ 69} Michael Berninger testified that he is employed by Ohio National Financial Services in the life insurance claims group. Berninger stated that the beneficiary designation on a policy governs the payment of the proceeds on the policy. He identified State's Exhibit 80 as "part of a policy application" in William's name, and State's Exhibit 81 as a "Designation of Beneficiary and Settlement Method Agreement" for the policy, dated July 12, 1990, which identifies "Kathleen Ely, Vickie Hilgeford, Kelly Schaurer, Bart Lawhorn, Brent Lawhorn and Schott Schauer, Nieces and Nephews" as contingent beneficiaries.

{¶ 70} Berninger testified that he received a phone call from Marcum on August 28, 2013, and that he "told her there's a pending claim. I don't know if we identified the beneficiaries at that time but she indicated to us that the nieces and nephews that had been named * * * had cleaned out bank accounts and so forth." He stated that it was

relayed to him that Marcum identified herself to a customer service representative "as the adopted daughter" of the Stambacks. Berninger stated that Marcum told him that "she had documents that could show that the accounts were being cleaned out." He stated that he told Marcum he would "do a fair review of the claim" and to send him the documents she had.

{¶ 71} After reviewing notes he took of the call with Marcum, Berninger stated that Marcum provided the following phone number to him: 937-542-9090. He stated that he received faxed copies of Willa's and William's wills from an attorney working for Marcum. Berninger stated that State's Exhibits 17 and 18 are accurate copies of the wills he received. He stated that both wills named Marcum as the contingent beneficiary. Berninger stated that he also received Exhibits 21 and 22, the addendums to the wills, via fax, which he identified. Berninger stated that he anticipated receiving from Marcum "some sort of documents that the nieces and nephews were not entitled to the benefit even though they had been named."

{¶ 72} Berninger stated that he had several subsequent conversations with Marcum, and that he told her that the payout on the life insurance policy was governed by the beneficiary designation on the policy. He stated that Marcum told him, "I don't think you got the right thing." He stated that he then received via fax "kind of a homemade change of beneficiary form." He testified that State's Exhibit 82, bearing the purported signatures of Renee Frost and James Combs as witnesses, is an accurate copy of what he received. He testified that ultimately "[w]e paid the named beneficiaries, the nieces and nephews." Berninger stated that the address Marcum provided to him was 410 N. Snyder Road, Dayton. On cross examination, Berninger stated that the total paid to the

contingent beneficiaries listed in the July 12, 1990 policy was $19,300.00.

{¶ 73} Rachel Ferrara testified that she is an associate attorney at Smith, Rolfes and Skavdahl Company LPA in Cincinnati, practicing "mostly insurance defense." Ferrara stated that Marcum "presented a claim under an insurance policy and I took examination under oath testimony from her." She stated that the policy was issued by the National Mutual Insurance Group, which is a subsidiary or affiliate of Ferrara's client, Celina Insurance. Ferrara stated that Marcum filed a "theft-loss claim for personal property." According to Ferrara, Marcum was residing at 16 West Walnut Street at the time, and "she was seeking coverage for these personal property items that were stolen from the residence she was residing in."

{¶ 74} Ferrara stated that the named insureds on the policy were Willa and William Stamback. Ferrara stated that Marcum "described [the Stambacks] as her parents and she was their daughter and that her daughter, Christina was their granddaughter." Ferrara testified that Marcum "provided several different stor[ies] with regard to how she became acquainted first with the Stambacks and then took over their healthcare needs."

{¶ 75} Ferrara testified that Marcum "said she was not paid by the Stambacks when she was providing care for them herself. She was paid in some shape or form by Right at Home when she was in their employ but was not paid by the Stambacks." When asked if Marcum reported receiving gifts from the Stambacks, Ferrara stated that Marcum "recounted receiving a Christmas gift in the amount of a thousand dollars * * * as well as the Stambacks' vehicle that was given to her in * * * March 2013."

{¶ 76} According to Ferrara, in the course of her examination, she learned that Marcum obtained the Stambacks' powers of attorney. When asked if she spoke to

Marcum about William's relationship to Willa, Ferrara stated that Marcum "said that it was very clear William loved Willa very much and that he would sign anything if he thought it was for Willa. You could use his wife to get him to do anything." According to Ferrara, Marcum stated that she did not become aware that she was the contingent beneficiary on the Stambacks' wills until after the estate was submitted to probate.

{¶ 77} When asked if Marcum discussed Brandon Mitchell, Ferrara stated that "Mr. Mitchell had been dating her daughter, Christina for one to two weeks and * * * had been staying at the Stambacks' home, I believe on the date of the recorded theft." Ferrara stated that Marcum testified that she learned that her powers of attorney had been revoked from the Phillipsburg police after she was released from custody in April of 2013, and that she "indicated that she was unable to access any of the Stambacks' bank accounts." Ferrara stated that Marcum "quite often referred to the Stambacks' nephew, Mr. Schaurer * * * having access to various accounts and taking money from those accounts."

{¶ 78} On cross examination, Ferrara stated that Marcum reported that "electronics, clothing, possible furniture" had been stolen from the Stambacks' home. She stated that the claim was reported after the Stambacks died, and that Marcum was acting as the legal representative of the estate. Ferrara testified that she obtained "probate documentation indicating that [Marcum] had been appointed the fiduciary of the estate." She stated that Marcum's claim for an amount between $20,000.00 to $40,000.00 was denied on April 16, 2014. She stated that Marcum's deposition occurred on April 2, 11, and 14 or 15, 2014.

{¶ 79} Byron Boykin testified that on May 17, 2015, he bailed his son out of the

Montgomery County Jail, and that at that time a female individual unknown to him, whom he identified as Marcum in court, approached him and asked him if he had identification. Boykin stated that Marcum told him that she left her identification at home and "wanted to put money on her daughter's books." He stated that Marcum told him that she would pay him to do it, he agreed, and that Marcum "gave me like five bucks." Boykin stated that he used his driver's license to deposit $100.00 for Marcum into the account of an unknown person. When shown State's Exhibit 85, the resident transaction details record for Gillette, Boykin stated that he does not know Melissa Gillette.

{¶ 80} At the conclusion of the State's case, defense counsel stipulated that CarMax purchased the Stambacks' Cobalt for $7,500.00. The court then overruled Marcum's Crim.R. 29 motion for acquittal.

{¶ 81} Jay Carter testified that he is an attorney practicing in Dayton, and that Marcum is his client. He identified State's Exhibit 17 as William's February 20, 2013 will that he filed in Montgomery County Probate Court, as well as State's Exhibit 18 as Willa's February 20, 2013 will that he filed in the same court. Carter stated that he became involved with Marcum in July or August of 2013. Carter stated that the wills were admitted to probate and "there has not been any type of will contest." He testified that Marcum is the executor of the Stambacks' estates. When shown State's Exhibits 19 and 20, William's and Willa's April 22, 2013 wills, Carter stated that he became aware of them "through an attorney in Troy by the name of Gary Weaks," who represented Scott Schaurer. Carter stated that State's Exhibits 19 and 20 have not been presented to the probate court for approval as superseding wills to those filed by him. Carter stated that he spoke to Schaurer on the phone, and that Schaurer "was advocating the authenticity

of State's Exhibit 19 and State's Exhibit 20."

{¶ 82} Carter testified that when he became aware of the wills, he also "became aware of a guardianship that was open in probate court" for William.   He stated that once he "became aware of the guardianship, I went to probate court to check the file of the guardianship specifically to look at the * * * date of the doctor's evaluation."   Carter testified that "the date of the evaluation was dated one day prior to the date of State's Exhibit 19." Carter testified that he then contacted Weaks and "indicated my knowledge about the guardianship being filed, indicated my knowledge of the date of the doctor's evaluation and Gary said he would get back to me." Carter stated that Weaks subsequently, at the end of August or September of 2013, advised him that "he was not going forward in terms of the presentation of these wills and had returned the originals to Mr. Schaurer."

{¶ 83} Carter testified that at that time, he "filed a motion in probate court for the production of the wills."   He stated that his "initial motion was directed at Gary Weaks. Once he received that motion that's when he indicated he returned the original to Scott Schaurer.   Then that motion was directed to Scott Schaurer."   According to Carter, there "was a hearing that Scott Schaurer was mandated to attend * * * and at that hearing, Scott Schaurer produced the two original wills of state's Exhibit 19 and state's Exhibit 20." Carter stated that "there was a rather complicated question as to how these wills were going to be presented because no one wanted to present them."   Carter testified that Schaurer was named as the executor in the April 22, 2013 wills, and that he did not want to present them.   Carter stated that the probate court ordered Schaurer to turn the wills over to him. Carter testified that he "tried to figure out a way to possibly get them admitted

because there's an issue of later-dated wills." Carter stated that he "wanted to try to rectify that problem but because no one wanted to present the wills, I finally put them on deposit in Montgomery County probate court" in the "safekeeping division," where they remain unpresented. Carter stated that since Willa predeceased William, William's will is controlling, that the contingency occurred, and Marcum is the sole beneficiary.

{¶ 84} On cross examination, Carter stated that he did not file State's Exhibit 21 and 22, the addendums to the Stambacks' wills. He stated he submitted documents for Marcum to Ohio National Financial for payment on William's life insurance policy. Carter testified that he had not yet done an accounting of the estate pending the outcome of Marcum's trial. He stated that "if there's a conviction in this matter, Ms. Marcum would probably be removed as executor and we would have to filing [sic] an accounting from the date that she was named as fiduciary up until the date that she was removed." He stated that an executor has a fiduciary duty to the estate even if the executor is the sole beneficiary. After viewing State's Exhibits 73, 74 and 75, checks made out to cash in an aggregate total of $2,260.00, on the estate account ending in 0037, and signed by Marcum on August 12, 16, and 22, 2013, Carter was asked if cash withdrawals make an accounting more difficult. Carter responded, "Yes, but I mean, it couldn't be justified." Carter stated that he was not present when the wills he presented to probate were signed. He stated that beyond his knowledge of William's guardianship, he has no direct knowledge of William's mental condition when he signed any documents.

{¶ 85} Marcum testified on her own behalf. Regarding the bribery offense, Marcum stated that Gillette asked to see her and that Attorney Barry Galen advised Marcum that it was okay to go visit her at the jail. Marcum stated that she asked Gillette

why she was lying and asked her to tell the truth, and that Gillette stated that "[Detective] Shaw was hounding her continuously and that it wouldn't stop and that she just wanted it over with and she was about to get the Monday program out of it." Marcum testified that she "begged" Gillette to tell the truth, that Gillette asked her to put money on her commissary account because she was "starving," and that Marcum told Gillette that she would not pay her to tell the truth. Marcum stated that Gillette then asked to "borrow a hundred dollars." Marcum stated that she "didn't think anything about it." She stated that her purse was in her car and since she did not have her identification, she asked "that gentleman in there to put that money on the books." Marcum denied giving Gillette money to alter her testimony, and she stated that the money had nothing to do with Marcum's request that Gillette speak to Marcum's lawyer. Marcum stated that Gillette "never worked out there at the Stambacks'."

{¶ 86} When asked how she became acquainted with the Stambacks, Marcum stated that her husband has several friends in the Phillipsburg area, one of whom lived "right behind the Stambacks'. Her name was Carol and she became a great friend of mine. And I would walk my dogs up and down the street and help them with their groceries in and out from their car when they would come home or something and I would see them. That is how I got to know them."

{¶ 87} Marcum stated that while on one of her walks, she observed that a nurse was at the Stambacks' home, and that she talked to the nurse and learned that she worked for Right at Home. Marcum stated that she told the nurse that she used to be employed at Right at Home. Marcum stated that she contacted Right at Home "and asked for my job back." Marcum stated that Michael Manes hired her and a week later

she went to work for the Stambacks.

{¶ 88} Marcum stated initially, in "August, October, somewhere around there of 2012," Willa was in Good Samaritan Hospital and that Marcum only provided care for William. She stated that she cleaned the house, washed the dishes, prepared food, and transported William to the hospital every day to visit Willa. Marcum stated that she worked 12-hour shifts.  Marcum stated that William told her that getting Willa back home was the most important thing to him.  According to Marcum, she told William, "no matter what we'll find a way to get her here."  She stated that "[m]e and my daughter is the reason why she came home."  Marcum testified that "Mr. Stamback was a very cantankerous person and if you didn't make Willa happy, he would never be happy.  So he fought with a lot of other care givers and he had fired a lot of other care givers.  So I ended up being the only care giver at that time and he had fought with his niece on a regular basis, which was Kathy Ely."  Marcum stated William and Ely fought over "[m]oney and Willa because [Ely] stated that Willa was never coming back home."

{¶ 89} Marcum stated that William fired Ely as p.o.a. and that she, Manes and Dean Roberts contacted people in the family, "trying to get them to take POA," including Schaurer and "everyone turned us down." Marcum stated that William "asked me and begged me and I took it."

{¶ 90}  In order to bring Willa home, Marcum stated that she and her daughter "had to take a lot of studying and a lot of classes."  Marcum testified that she and her daughter had to learn how to take care of Willa's tracheotomy and to use the machines Willa needed.  She stated that Willa had been moved from Good Samaritan to Kindred Hospital at the time, and that her doctors imposed requirements on her and her daughter

for Willa's release. Marcum testified that when Willa came home from Kindred Hospital, she was working 24 hours a day at the Stambacks' home.

{¶ 91} Marcum stated that on or about February 20, 2013, William made an appointment with Treherne "that I knew nothing about at this time." She stated that she was asked to take William to the appointment and did so. She stated that she was asked to leave the room after Treherne explained the duties of a p.o.a., and that William executed the powers of attorney in her favor.

{¶ 92} When shown State's Exhibit 25, the check made out to Melanie Vance on March 7, 2013 on the account ending in 4480, Marcum stated that Vance was "a worker that worked there a short period of time." She stated that she and William signed the check for "care giving." Regarding State's Exhibits 26, 27, 28, 29, Marcum stated that they are all legitimate checks for work that was actually done at the Stambacks' home

{¶ 93} Marcum stated that the Chevy Cobalt "was used by all employees that worked for Right at Home, including myself." She stated that after she obtained the powers of attorney, she "didn't let other care workers use the vehicle to transport around people in it." She stated that William offered to give her the car for a birthday present since she was "doing all the driving for him."

{¶ 94} When asked about McConnell and State's Exhibits 35 and 36, the checks dated April 17, 2013, made out to McConnell for $600.00 and $1,200.00 on the account ending in 4480, Marcum stated that she met McConnell through Greg Graley and hired her to help her at the Stambacks'. According to Marcum, "Jill just lasted six days and she was just really sluggish and late and just acting weird [and] I ended up letting her go because of the fact and I felt she was on drugs." Marcum stated that the checks were

legitimate and that she and William signed them. Marcum stated that William "would sign like five or six checks ahead of time for payroll. He would put his signature just in case * * * that he couldn't write or he wasn't around at that time." Marcum stated that she "would always just sign under, POA, my name." When asked by the court if McConnell's testimony that she never worked for the Stambacks was "just a straight boldface lie," Marcum responded affirmatively.

**{¶ 95}** When asked about State's Exhibit 38, the check dated April 17, 2013, made out to Gregory Graley in the amount of $636.42 on the account ending in 4480, Marcum stated that the check was for car repair, and that William signed it. Marcum stated that State's Exhibit 40, the check dated March 21, 2013, to Brandon Mitchell on the account ending in 4480, was written after she drove the Cobalt "into the garage and knocked the whole side of the wall out on it" when it was "snowy out." According to Marcum, Mitchell repaired the garage and painted the front part of the Cobalt. She stated that Mitchell also repaired the Stambacks' clothes dryer. Marcum stated that she and William signed State's Exhibit 40. Marcum stated that State's Exhibit 41, the check to Mitchell dated March 26, 2013, in the amount of $63.71, on the account ending in 4480, was written to reimburse him for groceries that Mitchell had purchased for the Stambacks. Marcum stated that State's Exhibit 42, the check to Mitchell dated April 8, 2013, in the amount of $880.00, on the account ending in 4480, was written after Mitchell repaired the Stambacks' roof and gutters and cleaned out their garage. She stated that she signed the check. Marcum stated that State's Exhibit 43, the check to Mitchell dated April 15, 2013, in the amount of $1,200.00, on the account ending in 4480, signed by Marcum, was for the care Marcum's daughter provided to the Stambacks. She stated that her

daughter "always had Brandon cash her checks."

{¶ 96} Marcum testified that State's Exhibits 44 and 45 are receipts for purchases made by her at "Cato's Closet" at William's request. Exhibit 44 reflects that Marcum purchased 27 items on April 8, 2013 and signed an electronic check for $300.38, and Exhibit 45 reflects that she purchased 23 items on April 13, 2013 and signed an electronic check in the amount of $206.33. According to Marcum, William "[a]sked me to go out and pick up some things for his wife and he said a few things for myself if I'd like." Marcum stated that she purchased a scarf and a pair of shoes for herself, and the other items that she purchased were stolen, resulting in the insurance claim. According to Marcum, she hired Angel Olson, who is her cousin, as a caregiver. She stated that the items she bought for Willa did not fit and were in a bag in the trunk of the car with the receipts so she could return them when the bag "disappeared from the trunk of the car." Marcum stated that she called Cato's Closet and advised them that if someone tried to return the items that they were stolen. Marcum stated that Olson attempted to return the items and "the police showed up there and confiscated * * * the clothing."

{¶ 97} Marcum stated that State's Exhibit 47 is a Walmart receipt in the amount of $286.36. It is dated April 14, 2013 and lists approximately 27 items of clothing and a "5PK LTR." Marcum stated that "this is where Mr. Stamback had me go pick up things from the store for him and * * * Mrs. Stamback and * * * he said I could pick up anything I wanted for me but I picked up one thing for me, which was a pack of lighters." Marcum stated that State's Exhibit 47 A reflects her signature on the electronic check for the purchase.

{¶ 98} Marcum testified that State's Exhibit 51, her signature card for the account

ending in 4480, dated March 15, 2013, reflects when she obtained the Stambacks' powers of attorney. She stated that the p.o.a. documents were actually signed on February 22, 2013.

{¶ 99} Marcum stated that State's Exhibit 53, the check made out to Gary Williams that appears to be dated April 13, 2013, in the amount of $550.00, on the account ending in 4480, "is for the deck out back.  He had to build the ramp that they required before Willa could come home from Kindred Hospital." She stated that Williams is her husband, and that after getting estimates for the deck and ramp in amounts of $3,500.00 and higher, "my husband just did it for the 550."

{¶ 100}  Marcum stated that State's Exhibit 54, the check dated April 15, 2013, signed by Marcum as p.o.a., in the amount of $1,000.00, made out for cash on the account ending in 4480, was written because "Willa liked to keep cash in her pocket and this is what she asked me to go over [and] get her from the bank."  Marcum stated that Willa "kept a little wallet beside her" for her cash.

{¶ 101} Marcum stated that State's Exhibit 55, the check dated April 18, 2013, made out to Marcum for six days of "caregiver pay," in the amount of $1,200.00, on the account ending in 4480, "is for my daughter's pay.  She did not have her ID so this is one that I had to cash for her."

{¶ 102} Marcum testified that William "purchased a computer because he had liked how I was doing things on mine * * * ."  She stated that "he was watching and he could see that there was a lot of stuff in there that was not stuff that he had given permission for."  Marcum stated that there were charges billed for AT&T, for example, and that William did not have AT&T, as well as other unauthorized charges.  Marcum stated that

she "disputed them with the bank and I managed to get back $2,800 the first week that I was in charge, a POA. I got $2,800 back for Mr. Stamback." She testified that the "bank gave us the name of who was doing it and then they credited the money back" to the account due to her investigation.

{¶ 103} Marcum stated that when Schaurer took over as p.o.a., all the Stambacks' bills were current "other than the [property] taxes had been behind by three years, which I am still catching up." She testified that there was $35,000.00 in the account at the time Schaurer became p.o.a. on May 4, 2013. She stated that when she opened the estate account, $4,909.63 remained in the account ending in 8128. She stated that she deposited $3,409.63 into the estate account. Marcum stated that she opened the estate account on August 10, 2013. She stated that State's Exhibit 73, a check made out for cash on the estate account in the amount of $1,100.00 was "to pay for 600 for wills and I had to put money down for the taxes * * * because they were going to take the house." Regarding State's Exhibit 74 on the estate account for cash, Marcum stated that "a thousand of this went on towards the taxes and then 300 was on the bills that Scott had left behind for me to catch up," as well as payments for water and trash. Regarding State's Exhibit 75, a check for cash on the estate account in the amount of $860.00, Marcum stated that "this was where Vectren was still owed and then the rest of the trash and water because they were so high because none of it had been paid that whole time from since I was POA."

{¶ 104} Marcum denied that her handwriting is on State's Exhibit 82, the change of beneficiary form dated March 10, 2013.

{¶ 105} When shown State's Exhibit 61, the May 3, 2013 check to Melissa Gillette

in the amount of $1,580.00, with "Caregiver 2 wks 14 days," on the memo line and bearing the phone number 937-542-9090, Marcum testified that she had "no idea" who wrote the check, and that she did not do so.

{¶ 106} Marcum stated that in March of 2013, a hospice worker "had stolen the box of prescriptions of William Stamback," and that she reported it to Officer Schwieterman and provided a written statement. Marcum stated that she later learned that the worker was named Tonya Driggs. Marcum stated that Driggs had also been writing checks on the Stambacks' account. Marcum stated that she does not know if Driggs was arrested. Marcum stated that she also contacted Detective Shaw and made a written report after July 20, 2013. She stated that she did not hear from Shaw until she was charged herein. She stated that on April 17, 2013, she was arrested for jaywalking, and that when she got out of jail the next day, she was contacted by the Phillipsburg police who told her that she was banned from the Stambacks' property. She stated that at the time William and Willa were in the hospital.

{¶ 107} On cross-examination, Marcum testified that William was not her father "in the court of the law but to me he was." Marcum testified that she referred to herself as "the only daughter [the Stambacks] had" in a letter to Ohio National Financial Services. She acknowledged that she testified under oath before Ferrara that the Stambacks were her parents and that her daughter was the Stambacks' granddaughter. She acknowledged that in conversations with the Phillipsburg police that she referred to the Stambacks as her parents.

{¶ 108} Marcum testified that she has resided at 410 and 420 North Snyder Road. She denied ordering checks online on the Stambacks' account for delivery at 420 N.

Snyder Road. She stated, "I can say that my lap top had been stolen during the robbery and my cousin was the one that stole it that lived with Melissa Gillette and all my passwords and everything were secure in my laptop. Everything – you didn't need one when you got into my laptop." Marcum testified that her phone number is (937) 542-9090, and she acknowledged that Gillette cashed State's Exhibit 61 on May 3, 2012, with that number written on the check.

{¶ 109} Marcum acknowledged that State's Exhibit 85, the record of transactions on Gillette's commissary account, reflects that prior to the deposit of $100.00 by Boykin into the account on May 17, 2015, Gillette received another deposit of $100.00 on May 15, 2015. Marcum testified that she was aware that Gillette was going to testify that Marcum gave her a check to cash for work that Gillette did not perform.

{¶ 110} Marcum testified that most of the people working for Right at Home "were robbing the Stambacks." She stated that William "was telling me and * * * money * * * was disappearing from his wallet." She stated that she did not have "proof" until she obtained the Stambacks' powers of attorney and was able to get online and view the checking account. Regarding Willa's will addendum, which specifically bequeaths, inter alia, Willa's wedding rings to Marcum's daughter along with $500.00, Marcum acknowledged that Willa was unable to type or dictate. Marcum denied typing the addendums. She stated that she became aware of them after William died.

{¶ 111} When shown State's Exhibit 59, a Chase statement for the account ending in 4480, which reflects an April 9, 2013 check written to Toys R US for $271.08, Marcum stated that William asked her to make the purchase for Marcum's "grandbaby."

{¶ 112} Marcum stated that Willa signed the Cobalt over to her on March 12,

2013. When asked why the Stambacks wrote a check to Graley for car repairs after she took possession of the car, Marcum stated that "I used the car to do everything they still needed me to do. That is why he wanted to pay for the repairs." She stated that she sold the car to CarMax.

{¶ 113} We note that at the conclusion of the evidence, the State moved to amend Count III of the indictment, which specified a date of March 12, 2013 for the tampering with records offense. The State requested that "the date only be extended from that date through April 20, 2013, which was the date that the title was offered and further, through May 13, 2013, which was the day that the odometer record was done." The court permitted the amendment over objection.

{¶ 114} On December 28, 2015, a "Memorandum in Support of Defendants' Renewal of Motion for Rule 29" was filed.

{¶ 115} Marcum asserts three assignments of error herein which we will consider together. They are as follows:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT COUNSEL'S MOTION FOR RULE 29.

And,

THE TRIAL COURT ERRED WHEN IT FOUND THE APPELLANT GUILTY AS THE EVIDENCE PRESENTED IS ENTIRELY INCONSISTENT WITH THE REQUISITE MES REA ON ALL COUNTS.

And,

THE TRIAL COURT ERRED WHEN IT FOUND THE APPELLANT GUILTY CONTRARY TO THE WEIGHT AND SUFFICIENCY OF THE

EVIDENCE.

**{¶ 116}** As this Court has previously noted:

"A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). An appellate court applies the same standard when reviewing the denial of a Crim.R. 29(A) motion as is used to review a sufficiency of the evidence claim. *State v. Sheppeard,* 2d Dist. Clark No. 2012 CA 27, 2013-Ohio-812, ¶ 51.

In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

Because the trier of fact sees and hears the witnesses at trial, we

must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 21. The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*State v. Page*, 2d Dist. Montgomery No. 26670, 2017-Ohio-568, ¶ 7-9.

{¶ 117} R.C. 2913.47 proscribes insurance fraud and provides in relevant part as follows:

(B) No person, with purpose to defraud or knowing that the person is facilitating a fraud, shall do either of the following:

(1) Present to, or cause to be presented to, an insurer any written or oral statement that is part of, or in support of, an application for insurance, a claim for payment pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive[.]

{¶ 118} "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). R.C. 2901.22(B) provides: "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be

of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

{¶ 119} R.C. 2913.02 proscribes theft and provides in relevant part:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent[.]

{¶ 120} R.C. 2913.42 proscribes tampering with records and provides in relevant part:

(A) No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following:

(1) Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record;

(2) Utter any writing or record, knowing it to have been tampered with as provided in division (A)(1) of this section[.]

{¶ 121} R.C. 2921.02 proscribes bribery and provides in relevant part:

* * *

(C) No person, with purpose to corrupt a witness or improperly to influence a witness with respect to the witness's testimony in an official

proceeding, either before or after the witness is subpoenaed or sworn, shall promise, offer, or give the witness or another person any valuable thing or valuable benefit.

### I.   Insurance Fraud

{¶ 122}   James Combs testified that he signed State's Exhibit 82, the March 10, 2013 change of beneficiary form, at Marcum's request, and that he did not witness the signatures of Willa or "Renee Frost" on the document. He stated that Marcum told him to date the form March 10, 2013.   Renee Hensley testified that she did not sign State's Exhibit 82 or witness the signatures thereon, and she stated that, while she was formerly known as Renee Frost, she did not use the name of Frost at the time the form was signed. She stated that she received photographs via text messages from Marcum of her "signature" and the Stambacks' home, so that she could attest "that I had been there and that was the signature that was signed."

{¶ 123} Michael Berninger testified that Kathleen Ely, Vickie Hilgeford, Kelly Schaurer, Bart and Brent Lawhorn and Scott Schaurer were the contingent beneficiaries on William's life insurance policy.   He testified that Marcum identified herself as the Stambacks' adopted daughter to a customer service representative at Ohio National Financial Services, and that she advised Berninger that the designated beneficiaries were not entitled to the proceeds of the policy.   Berninger stated that he received State's Exhibits 17 and 18, the Stambacks' wills dated February 20, 2013, and State's Exhibits 21 and 22, the addendums to the wills, from counsel for Marcum.   Berninger stated that he also received State's Exhibit 82 after Marcum told him, "I don't think you got the right thing."   Berninger stated that the above named contingent beneficiaries received

$19,300.00 from the policy.

**{¶ 124}** Rachel Ferrara testified that Marcum presented a "theft-loss claim for personal property" on a policy issued by the National Mutual Insurance Group that named the Stambacks as the insureds. Ferrara testified that Marcum identified herself under oath at a deposition in April 2014 as the Stambacks' daughter, and she testified that Marcum reported that "electronics, clothing, possible furniture" had been stolen from the Stambacks' home. Ferrara testified that Marcum reported the claim after the Stambacks died, for an amount between $20,000.00 to $40,000.00, and that the claim was denied.

**{¶ 125}** The trial court clearly credited the testimony of Combs, Hensley, Berninger, and Ferrara over the testimony of Marcum, and we defer to the trial court's assessment of credibility. Based upon the above testimony, we conclude that the trial court did not err in overruling Marcum's motion for acquittal, and that Marcum acted with a purpose to defraud, and knowing that she was facilitating a fraud, in presenting the claims for the proceeds of Williams' life insurance policy and for the items allegedly stolen from the Stambacks' home, in violation of R.C. 2913.47(B)(1). Having thoroughly reviewed the entire record, we further conclude that Marcum's conviction for insurance fraud is supported by sufficient evidence and not against the manifest weight of the evidence.

## II. Theft (beyond the scope of consent)

**{¶ 126}** Michael Manes testified that it was "highly irregular" for Marcum to serve as the Stambacks' caregiver as well as their p.o.a. He stated that in March of 2013, a little over three months after Marcum had been working for the Stambacks, Marcum advised him that the Stambacks were going to designate her as their beneficiary in their

wills.   Crystal Alexander testified that Ely typically cashed checks for the Stambacks in amounts between $300.00 and $500.00 a month, and that the amounts of the checks written by Marcum were "way out of the ordinary" and "much higher." We note that in the month of April, 2013, over $10,000.00 in checks were debited against the account ending in 4480.

{¶ 127}   As with the evidence of insurance fraud, we note that much of Marcum's testimony regarding the specific checks drawn on the Stambacks' accounts is contradicted by the testimony of other witnesses, and that the trial court clearly credited the other witnesses' testimony over Marcum's.   We again defer to the trial court's assessment of credibility.   While Marcum testified that State's Exhibits 25 – 29, on the account ending in 4480, for caregiving to Melanie Vance Ryan and Katherine Wiggins, were legitimate payments, Wiggins testified that while she was paid for her work, she was concerned that Marcum was subjecting the Stambacks to financial abuse. While Marcum testified that she perceived herself as the Stambacks' daughter and dutifully cared for them, Kathryn Harkenrider testified that after speaking with Katherine Wiggins, she provided a statement to police due to concerns about the Stambacks' safety in Marcum's care, since Willa's feeding tube had been turned off, a portion of her tracheotomy had been removed more than once, and since the Stambacks had been left alone. Harkenrider stated that her concerns prompted 24-hour a day care for the Stambacks.

{¶ 128} While Marcum testified that State's Exhibits 35 and 36, checks dated April 17, 2013, on the account ending in 4480, to Jill McConnell for caregiving were legitimate, McConnell testified that she never met or provided care for the Stambacks.   She stated that Greg Graley asked her to cash State's Exhibit 35, in the amount of $600.00.

McConnell stated that Marcum paid her $100.00 to cash State's Exhibit 36, in the amount of $1,200.00, and that Marcum wrote State's Exhibit 36 in the car after learning that she was approved for the amount of $1,200.00. Greg Graley's testimony regarding Exhibit 36 is consistent with McConnell's. He further testified that Marcum owed him money and gave him $1,000.00 after McConnell cashed Exhibit 36.

{¶ 129} While Marcum testified that State's Exhibit 38, the April 17, 2013 check made out to Graley for $636.42 on the account ending in 4480, was for car repairs and was signed by William, because Marcum was still driving the car for the Stambacks, Graley testified that Marcum contacted him and told him that she had more money to give him, and that Marcum wrote the check in his presence at "the bar on Dixie." He testified that Marcum gave him the title to the Stambacks' Chevy Cobalt, and that he worked on the car only while it was in his possession, because he "drove it like crazy." Graley stated that he did not perform any work on the car for the Stambacks.

{¶ 130} Marcum testified that State's Exhibit 40, the March 21, 2013 check on the account ending in 4480 to Brandon Mitchell for $675.00, was to pay for repairs Mitchell performed on the Cobalt and the garage after Marcum had an accident in the vehicle, and that State's Exhibit 42, the April 8, 2013 check to Mitchell for $880.00 on the account ending in 4480, was for roof and gutter repairs and for cleaning the garage. Marcum further testified that State's Exhibit 43, the April 15, 2013 check payable to Mitchell for $1,200.00 on the account ending in 4480, was actually written to pay Marcum's daughter for care she provided to the Stambacks. Harkenrider, Ryan, and Wiggins testified that they never observed Mitchell perform any work or repairs at the home. While Marcum testified that her daughter "always had Brandon cash her checks," when asked about

State's Exhibit 55, the April 18, 2013 check made out to Marcum for $1,200.00, Marcum testified inconsistently that the check was written to pay her daughter for six days of caregiving. Joseph Schweiterman testified that Mitchell was found hiding in the Stambacks' bathroom and arrested on active warrants on April 16, 2013.

{¶ 131} Marcum testified that Exhibits 44 and 45, the April 2013 receipts from Cato's Closet, reflect items that she purchased for Willa at William's request, with the exception of a pair of shoes and a scarf, which Marcum purchased for herself with William's permission. The record reflects that Marcum signed electronic checks on the account ending in 4480 for the items. We note that Willa was on a ventilator and a feeding tube at the time, and that the purchases include, inter alia, 16 knit tops. Similarly, Marcum testified that State's Exhibit 47, the April 2013 Walmart receipt on the account ending in 4480, reflects items that William asked her to "go pick up" for him. She stated that she purchased only a pack of lighters for herself. We note that Exhibit 47 contains, inter alia, the following items: "3 pack bra," "Danskin Tee," "Ladies Wear," "Running Sh," and 3 items delineated "Scoop Top." Harkenrider testified that Willa was in end-stage respiratory failure, "vent dependent" and on a feeding tube at the time, and we conclude based upon Willa's age and physical condition that the trial court could reasonably conclude that Marcum's testimony defies credulity.

{¶ 132} Marcum testified that State's Exhibit 53, the April 13, 2013 check to her husband Gary Williams for $550.00, on the account ending in 4480, represents payment for the deck and ramp that Williams constructed so that Willa could come home from Kindred hospital. She stated that she obtained estimates for the project in amounts of $3,500.00 and higher. We note that Marcum did not introduce the estimates she

obtained, or any receipts for the materials for the project, or any photographs thereof.

{¶ 133} Marcum testified that she cashed State's Exhibit 54, an April 15, 2013 check written for cash on the account ending in 4480, in the amount of $1,000.00, because Willa, who again was on a ventilator and a feeding tube, "liked to keep cash in her pocket." We note that Alexander testified that Ely typically withdrew between $300.00 and $500.00 a month in cash for William, not Willa, and simply cashed Willa's monthly Social Security checks for her. Thus, the trial court could reasonably reject Marcum's explanation. Finally, while Marcum denied writing State's Exhibit 61, the check made out to Melissa Gillette, on the account ending in 3639, for $1,580.00, we note that the check bears Marcum's handwritten phone number and the memo line provides "caregiver 2 wks 14 days," in a manner similar to other checks signed by Marcum. Scott Schaurer, who held the Stambacks' p.o.a. at the time, testified that he did not authorize Gillette to have money from the account.

{¶ 134} Treherne testified that in April 2013, William called him and he went to see him in the hospital about the powers of attorney and wills. Treherne stated that William was lucid and told him that he wanted to change the p.o.a. designations and wills, and that Willa made her wishes known to him that she wanted to revoke Marcum's p.o.a. Treherne testified that Exhibit 19 and 20, the April 22, 2013 wills, accurately reflect the Stambacks' wishes. State's Exhibits 68, the August 10, 2013 withdrawal ticket signed by Marcum in the amount of $4,909.63 on the account ending in 8128, which was opened by Schaurer, and Marcum's deposit of $3,409.63 into the estate account opened by her on August 10, 2013 (which is $1,500.00 less than the amount she withdrew), as well as State's Exhibits 73, 74, and 75, all of which were made out to cash on the estate account,

are in direct contravention of the Stambacks' wishes as reflected in their wills and in Treherne's and Schaurer's testimony. By Marcum's own admission, she learned that she was "banned" from the Stambacks' property on April 18, 2013.

{¶ 135} While Marcum testified that she accepted the Chevy Cobalt as a birthday gift from William, Melanie Vance Ryan stated that she was aware that the Stambacks' owned the car because William "inquired about its whereabouts." As noted above, Hughes testified that he notarized the car title listing Willa as the owner, and that her printed name, address and signature were already filled in when Marcum presented the title to be notarized.

{¶ 136} Finally, State's Exhibit 97, the statement for William's savings account ending in 5272 from February 5, 2013 to March 5, 2013, reflects that on February 5, 2013, the account had a balance of $43,166.79, that there were four debits to "Health Right LLC" for close to two thousand dollars each, and a total of $3,000.00 was transferred into the account ending in 4480. There were withdrawals of over $10,000.00 during the month, and on March 4, 2013 the remaining $23,313.90 was withdrawn, leaving a balance of zero. We note that Alexander testified that the account had a balance of over $60,000.00 in October 2012, the month prior to Marcum's employment in the Stambacks' home.

{¶ 137} As noted above, the trial court clearly discredited much of Marcum's testimony regarding the Stambacks, their vehicle, and her actions as p.o.a. and executor, and we defer to the trial court's credibility assessment. We conclude that the amounts of the checks written by Marcum, as well as the close relationships she had to the recipients of the checks, further support a finding that Marcum acted beyond the scope

of the Stambacks' consent. Accordingly, we conclude that the trial court did not err in overruling Marcum's motion for acquittal on the theft from an elderly person offense, in violation of R.C. 2913.02(A)(2), and that Marcum, with purpose to deprive the Stambacks, knowingly obtained or exerted control over their property beyond the scope of the Stambacks' consent. Having thoroughly reviewed the entire record, we further conclude that Marcum's conviction for theft from an elderly person (beyond the scope of consent) is supported by sufficient evidence and not against the manifest weight of the evidence.

### III. Tampering with Records

**{¶ 138}** Glen Hughes testified that on March 12, 2013, he notarized State's Exhibit 31, the title to the Cobalt, without observing Willa's signature thereon, and that he notarized State's Exhibit 89, the Odometer Disclosure Statement, on May 13, 2013, which also reflects Willa's printed name and signature. Hughes stated that he does not know Willa. Marquis Sansom identified State's Exhibit 32 as the April 20, 2013 title to the Cobalt in Marcum's name. Sansom identified State's Exhibit 88 as the May 13, 2013 affidavit that Marcum submitted to the Auto Title Division of the Montgomery County Clerk of Courts indicating mileage on the Cobalt of 33,981 miles, as well as State's Exhibit 89.

**{¶ 139}** Based upon the testimony of Hughes and Sansom, which the trial court clearly credited, we conclude that the trial court did not err in overruling Marcum's motion for acquittal on the tampering with records offense and that Marcum, knowing that she had no privilege to do so, and with purpose to defraud, uttered State's Exhibits 31, 88, and 89, knowing that the documents had been tampered with, in violation of R.C. 2913.42(A)(2). In other words, having thoroughly reviewed the entire record, we conclude that Marcum's conviction for tampering with records is supported by sufficient

evidence and not against the manifest weight of the evidence.

## IV. Theft (checks)

**{¶ 140}** While Marcum denied ordering checks on line from the Stambacks' account, and testified that her lap top was stolen by her cousin who lived with Gillette, Exhibit 78, correspondence from Deluxe Corporation, reflects that an online order for checks in William's, Willa's, and Marcum's names on the account ending in 4480 was placed on April 22, 2013, the date that Marcum's powers of attorney were revoked. The checks were ordered to be sent to Marcum at her address of 410 N. Snyder Road. We note that Graley testified that Marcum offered him some checks, but that he was not interested in them since his identification expired and he would be unable to cash them. Alexander testified that Schaurer reported to her that checks unauthorized by him and signed by Marcum were being written against the account, and that they learned the checks were ordered on line. After Schaurer closed the account ending in 4480 and opened the account ending in 3639, Alexander testified that a check order was placed on the account ending in 3639 on May 7, 2013, for "next day shipping." State's Exhibit 79, correspondence from Deluxe Corporation, reflects that checks were ordered on line to be sent to William at 420 N. Snyder Road. Alexander stated that Marcum was never a signatory on the account ending in 3639. As noted above, State's Exhibit 61, the check to Gillette for $1,580.00, was written on the account ending in 3639 on May 3, 2013, and Schaurer testified that he did not authorize the payment to Gillette or know who she was. Gillette testified that she observed Marcum write the check before she cashed it.

**{¶ 141}** For the foregoing reasons, we conclude that the trial court did not err in denying Marcum's motion for acquittal on the theft of checks offense, in violation of R.C.

2913.02(A)(1).   Having thoroughly reviewed the entire record, we conclude that Marcum, with purpose to deprive the Stambacks, knowingly obtained the checks without their consent, and that her conviction for theft of the checks is supported by sufficient evidence and not against the manifest weight of the evidence.

## V.   Bribery

{¶ 142} While Marcum testified that the $100.00 deposited to Gillette's commissary account at jail was a loan she provided to her since Gillette was "starving" in jail, Gillette testified that on May 17, 2015, Marcum visited her in jail and asked her to testify at the upcoming trial that she "had worked for two weeks."   When Gillette informed Marcum that she had already provided deposition testimony against Marcum, Gillette stated that Marcum then asked her to speak to Marcum's lawyer.   Marcum's assertion that Gillette wanted to borrow money for food is further belied by State's Exhibit 85, the record of transactions on Gillette's commissary account, which reflects that Gillette received a deposit of $100.00 on May 15, 2015, just two days before Marcum's visit. Furthermore, Marcum asked Byron Boykin to make the disputed $100.00 deposit.

{¶ 143}   The trial court clearly credited Gillette's testimony over Marcum's, and we defer to the trial court's credibility assessment.   Accordingly, we conclude that the trial court did not err in overruling Marcum's motion for acquittal on the bribery offense, and that Marcum promised, offered and/or gave Gillette a valuable thing or benefit with the purpose to corrupt or improperly influence Gillette with respect to her testimony.   In other words, having thoroughly reviewed the entire record, Marcum's bribery conviction is supported by sufficient evidence and not against the manifest weight of the evidence.

{¶ 144} For the foregoing reasons, Marcum's three assignments of error are

overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Andrew T. French
Thomas M. Kollin
Nathan D. Boone
Hon. Richard S. Skelton